**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE CITY OF ARANSAS PASS** | § | **CIVIL ACTION NO. 2:19-cv-0124** |
| | § | |
| **V.** | § | |
| | § | |
| **UTILITY SERVICE CO., INC.** | § | **JURY DEMANDED** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE JUDGE NELVA GONZALES RAMOS:**

Plaintiff, City of Aransas Pass, files Plaintiff's Original Complaint, and would respectively show the following:

**I.**

**NATURE OF SUIT**

1.01   This suit arises out of a private contractor's fraud and breaches of its legal duties to inspect, repair, refurbish, renovate, and maintain the Aransas Pass Water Tower.

**II.**

**PARTIES**

2.01   Plaintiff, City of Aransas Pass ("The City"), is a governmental entity located in Aransas Pass, San Patricio County, Texas.

2.02   Defendant, Utility Service Co., Inc. ("USCI"), is a foreign for-profit corporation that may be served by and through its Registered Agent, CORPORATION SERVICE COMPANY d/b/a CSC-LAWYERS INCORPORATING SERVICE COMPANY, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3136.

### III.

### JURISDICTION AND VENUE

3.01    There is complete Diversity of Citizenship between Plaintiff and USCI.

3.02    The amount in controversy exceeds $75,000.

3.03    The causes of action accrued in San Patricio County, Texas. Venue is Proper in the UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS—CORPUS CHRISTI DIVISION.

### IV.

### FACTS

4.01    The City's 500,000 gallon, 140-foot-high, elevated water tower on East Wilson Avenue was constructed in the mid-1950s. It had survived, in a structurally sound condition, serious storms and wind events over the decades.

4.02    Indeed, the water tower had survived Hurricane Celia in 1970, which was by all accounts significantly more forceful and severe than Hurricane Harvey.

4.03    By 2013, the water tower was in a dilapidated condition, and it had not been renovated in many years. Recognizing the poor condition of the water tower, the City had approved a $2,000,000 bond sale for the express purpose of replacing the elevated water tower with a new tower.

4.04    On May 20, 2013, after the City had approved the $2,000,000 bond sale for the purpose of replacing the elevated water tower, USCI sent its salesman (Paul Jette), its Director of Sales for the Western Region (John Snodgrass), and one of its engineers (Kirt Ervin) to meet with the Aransas Pass City Council.

4.05    During that City Council meeting, USCI assured the City it was "able to determine the condition of the tank and what needs to happen to bring it to, like new condition."

4.06    USCI further assured the City that it had examined "the condition of each one of these tanks [including the elevated water tower], both the inside, outside, top, bottom, all the different aspects of the tank."  And USCI told the City it was unnecessary to replace the water tower because there was not anything wrong with the water tower "from a structural standpoint."

4.07    USCI promised the City "we have a scope of work that we know what we need to do to bring this up to State of Texas, to American Water Works Association and to OSHA [standards]. And once we do that scope of work, you'll be in compliance with all these organizations. If it takes additional work in order for us to get you compliant with all these organizations, then that's additional work that we have to do. But again, it doesn't change the fact that we have to keep in compliance and we have -- we have -- number one -- you know, sole source responsibility of the tanks."

4.08    USCI promised it would "be able to take care of the problems that we see today [and] also put a system in place so the tanks will be preventatively taken care of from this point forward."

4.09    USCI told the City that USCI could repair and maintain the water tower in compliance with American Water Works Association (AWWA) standards.

4.10    To that end, USCI proposed that the City enter its "Full Service Asset Management Program." Under this Asset Management Program, USCI promised that the

City would able to turn over the responsibilities of all of its water tanks to USCI. The focus was shifting from "reactionary maintenance" to "proactive maintenance". More specifically, USCI promised the City "[if] we can protect the steel and not allow that to be sacrificed, a water tower will literally last forever it it's proactively maintained."

4.11    USCI said over 2,000 other cities had hired USCI to maintain their water tanks under this "Full Service Asset Management Program."

4.12    USCI told the City it had over 100 crews at its disposal, so whether the elevated tank needed renovation, cleaning, or inspection, or even in the event of an emergency, under the Program the tanks would be taken care of with no additional costs—it was all included in the Asset Management Program.

4.13    The USCI team established its credibility with the City by noting that USCI was founded in 1963, and it was the largest provider of contract water tank maintenance in the United States of America. Additionally, USCI said it had over 750 employees in 10 service centers, and covered about 85 percent of the continental United States. Further, USCI represented that each year it inspected over 8,000 tanks, painted 1,400 tanks, and maintained over 5,000 tanks in its Asset Management Program.

4.14    According to the USCI management team, the City was better off rehabilitating the elevated water tower than replacing it.

4.15    USCI said it "is a company that has -- since the 1960's has taken care of water storage tanks. [USCI has] been both in the rehabilitation side of the business and [also] worked on the new -- building of new tanks, too. One of the things that [USCI] typically will find is it's almost always a better fit to be able to rehab a tank[.]" And

USCI assured the City it had determined the typical situation was also "the case in your situation."

4.16    USCI further promised the City that "[it would] also have single-source responsibility. Once we have a contract signed on that tank, when we go and paint the tank, we repair the tank, we do any of the work on the tank, we are going to stand behind it for the perpetual, for the full service life of the coating system. Same thing with any of the repairs. And so having that single source responsibility is something that most of our communities, they really find that as a very useful thing because when we come to paint the tank, when we come to repair the tank, when we come to inspect the tank, we're looking at it like we own the tank. As a result of having to stand behind it, we know that, you know, doing things halfway doesn't benefit either one of us."

4.17    USCI summed up the benefits of its Full Service Asset Management Program by making express statements to the City Council about the scope of work under the proposed agreement and its schedule of payments for the term of the agreement: "We're going to do a full renovation on each one of the tanks in the first year of the program there. But ultimately what we're going to do is that because of the bond and because of the way you're going about with the funding, we are going to go ahead and you are going to pay for this full renovation on each of these in the first year. The best thing is then you will have no more payments for the next five years."

4.18    USCI talked the City out of replacing its elevated water tower, and into its Full Service Asset Management Program. Indeed, USCI told the City: "We're saying we can rehab this elevated tank where you may have had somebody told you that you need to

replace it. We're confident enough that we can rehab the tank that, again, we're not only willing to perform the job but we are willing to stand behind it. We feel very confident that from a structural standpoint, that there's really not anything wrong with that tank."

4.19    Relying on USCI's representations, the City entered a multi-year, Full Service Asset Management contract with USCI to renovate and maintain its elevated water tower for ten years—the first five years of which were pre-paid—on May 21, 2013.

4.20    Under the contract, USCI agreed "to provide the professional service needed to maintain the City's 500,000 gallon water storage tank located at 235 East Wilson Avenue, Aransas Pass, Texas 78335."

4.21    Prior to the end of Contract Year 1, USCI was required to complete "an exterior renovation, interior wet renovation, and repairs" on the elevated water tower. USCI failed to complete the renovation and repairs until June, 2015—over two (2) years after the false promises and inducement leading the City into the contract.

4.22    Thereafter, on an annual basis, USCI was obligated to thoroughly inspect the tank and tower structure to ensure the structure was in a sound condition. USCI likewise failed to provide the City with a required Inspection Report in Contract Year 1 (2013), Contract Year 2 (2014), or Contract Year 5 (2017).

4.23    USCI also was obligated to furnish the engineering and inspection services needed to maintain and repair the water tower during the term of the contract.

4.24    The repairs USCI was obligated to perform included sway rod (wind rod) adjustments and steel parts.

4.25    Furthermore, USCI specifically agreed "TO INDEMNIFY THE [CITY] AND HOLD THE [CITY] HARMLESS FROM ANY AND ALL CLAIMS, DEMANDS, ACTIONS, DAMAGES, LIABILITY, AND EXPENSE IN CONNECTION WITH LOSS OF LIFE, PERSONAL INJURY, AND/OR DAMAGE TO PROPERTY BY REASON OF ANY ACT, OMISSION, OR REPRESENTATION OF THE COMPANY OR ITS SUBCONTRACTORS, AGENTS, OR EMPLOYEES."

4.26    In 2015, USCI allegedly completed the repair, refurbishment, renovation, sandblasting and painting of the water tower. Thereafter, USCI supposedly performed its contractually required "thorough inspections" post-renovation on June 5, 2015, and April 20, 2016. Both Reports represented: "Wind Rods: No deficiencies…".

4.27    Less than a year later, on or about August 25, 2017, the water tower sitting high above Aransas Pass residents, homes, businesses, buildings, and roads came crashing down when the corroded, weakened and disregarded support structure failed:



(Photo Credit: *www.GoogleEarth.com*)

4.28    The inspection, specification, repair, refurbishment, renovation, and maintenance services were deficient as manifested and shown below:



(Photo Credit: Jason Pohl/*USA Today Network*)

**V.**

## LIABILITY—FRAUD AND FRAUDULENT INDUCEMENT

5.01    The factual allegations above are fully incorporated here as if set forth in their entirety, and based upon those factual statements recited above, the City alleges the following causes of action for fraud and fraudulent inducement.

5.02    First the City states the elements of its legal claims, and second, the City relates the factual allegations to those claims in the paragraphs that follow below.

5.03    USCI committed fraud against the City. USCI made a material representation that was false; it knew the representation was false or made it recklessly as

a positive assertion without any knowledge of its truth; it intended to induce the City to act upon the representation; and the City actually and justifiably relied upon the representation and thereby suffered injury.

5.04    A material representation is one which a reasonable person would attach importance to and would be induced to act on in determining his choice of actions in the transaction in question.

5.05    USCI's representations concerning the structural integrity of the elevated water tower and its ability to repair and maintain the water tower in like new condition in compliance with AWWA standards are material representations which a reasonable person considering whether to replace the water tower or contract with USCI for repair, refurbishment and maintenance would consider important.

5.06    A    promise    of    future    performance    constitutes    an    actionable misrepresentation if the promise was made with no intention of performing at the time it was made.

5.07    Contrary to USCI's representations, USCI had no intention of performing one or more of its promises that it "would do a full renovation" on the elevated tank in the first year of the contract; that it would "take care of the problems that we see today;" that it would "bring [the water tower] to, like, new condition;" that it was "not only willing to perform the [rehabilitation] job but we're willing to stand behind it;" and/or that it would "do that scope of work [necessary for the City's water tower to] be in compliance" with American Water Works Association standards.

5.08    Further USCI knew one or more of its representations that it was "able to determine the condition of the tank and what needs to happen to bring it to, like new condition;" that it had examined "the condition of each one of these tanks [including the elevated water tower], both the inside, outside, top, bottom, all the different aspects of the tank;"   that there was not anything wrong with the water tower "from a structural standpoint;" that it "would do a full renovation" on the elevated tank in the first year of the contract; that it would "take care of the problems that we see today;" that it would "bring [the water tower] to, like, new condition;" and/or that "we have a scope of work that we know what we need to do to bring this up to State of Texas, to American Water Works Association and to OSHA[, a]nd once we do that scope of work, you'll be in compliance with all these organizations" were false; or USCI made the representations recklessly as positive assertions without any knowledge of their truth.

5.09    Despite the presence of one of its "professional engineers" at the City Council meeting and USCI's assurance that he "has looked over the documents too," no engineer had inspected the City's elevated water tower or evaluated its structural integrity before (or after) USCI made its representations to the City Council.

5.10    The photographs presented by USCI at the City Council meeting showed significant deterioration of structural components, including wind rods and riser rods, and USCI told the City "[t]hey're getting to the point of being structurally unsafe;" yet without any evaluation beyond a salesman's visual inspection, USCI affirmatively represented to the City that the water tower did not need to be replaced, that there was not anything wrong with the tank from a structural standpoint, and  that it would bring the

water tower to like new condition. Further in litigation with Herb Lancaster, USCI has admitted that it never intended to comply with all AWWA standards—only those regarding coatings—contrary to its representations to the City Council.

5.11    In 2013, USCI had examined "the condition of each one of these tanks [including the elevated water tower], both the inside, outside, top, bottom, all the different aspects of the tank," and USCI knew that structural elements of the water tower were "getting to the point of being structurally unsafe." Yet USCI did not thoroughly reinspect the water tower two years later in 2015 before subcontracting the entire repair and refurbishment project out to TankEZ Coatings, Inc.

5.12    Incredibly and unbeknownst to the City, USCI—the largest water tank refurbishment company in the United States of America—subcontracted the entire labor-aspect of the refurbishment project over to a sub-contractor with less than 1% of employees and support staff as USCI.

5.13    USCI has admitted that this was USCI's project, that USCI controlled the manner, means and details of the job, that USCI determined whether and which wind rods and other structural members were to be replaced, and USCI retained the 100% of the inspection-aspects of the job.

5.14    At the beginning of the renovation project TankEZ's principals reported the shocking conditions of the water tower to USCI by e-mail dated February 19, 2015. USCI instructed its sub-contractor to paint over the dilapidated wind rods and just "get the job done":



---------- Forwarded message ----------
From: **tankezcoatingsinc** <tankezcoatingsinc@gmail.com>
Date: Thu, Feb 19, 2015 at 2:16 PM
Subject: Aransas pass pics
To: Sonia Alvarado <salvarado@utilityservice.com>

Please show these to Jimmy.

Sent from my T-Mobile 4G Android device

--
Thanks,

Miguel Flores,
Tankez Coatings Inc.
817-714-1016

### TANKEZ'S FEBRUARY, 2015, E-MAIL WARNING USCI



### ONE OF MULTIPLE DILAPIDATED CRITICAL STRUCTURAL MEMBER—WIND RODS

5.15   TankEZ's owner, Antonio Landaverde, also informed USCI about the dilapidated condition of the water tower structure by <u>telephone</u>. Again, USCI instructed its subcontractor to paint over the defects.

> 2      Q.   And what did Jimmy tell you when you
> 3   mentioned to him that the wind rods needed to be
> 4   replaced?
>
> 10      A.   Not mess with that, keep -- let's get the job
> 11   done, paint it.

(Landaverde sworn testimony, p. 47)

5.16   As if an e-mail and telephone conversation were not enough notice to USCI, Mr. Landaverde also pointed out the structural problems to USCI's inspector <u>face-to-face</u>.

> 2      Q.   You pointed it out to USCI's inspector, what
> 3   you had concern about.
> 4      A.   Yes, sir.
> 5      Q.   And they still told you to keep going?
> 6      A.   I don't know the reason why -- or I don't
> 7   know anything else.
> 8      Q.   But they told you to keep going.
> 9      A.   Yes, sir.

(Landaverde sworn testimony, p. 132)

5.17   Despite USCI's actual knowledge of the structural deficiencies of the water tower structure—which was the "worst tank [Landaverde had] ever seen", USCI withheld

the defects and deficiencies from the City and took no steps to comply with its representations and/or fulfill its promises to the City.

```
12         Q.  Okay.  So USCI, even though you told them
13   that you had some concern about some of the -- the
14   structural members, the -- the rods, they told you to
15   paint over them anyway, didn't they?
16         A.  Yes, sir.
17         Q.  Has that ever happened in any other jobs with
18   other -- other employer -- other employers?
19         A.  This is the worst tank I ever seen, so.
```

(Landaverde sworn testimony, p. 34)

5.18    Additional examples of the structural deficiencies that USCI lied about and failed to disclose to the City appear below:



**SERIOUSLY CORRODED CLEVIS—NEARLY 100% CORRODED AWAY**





**SERIOUSLY CORRODED CLEVIS AND A CLEVIS CONNECTION PLATE**



**CLEVIS 100% CORRODED AWAY THEN PAINTED OVER**



**CLEVIS 100% CORRODED AWAY THEN PAINTED OVER**

 

**TYPICAL CORROSION OF MULTIPLE WIND RODS**

5.19    USCI intended for the City to rely on its representations in foregoing the planned replacement of the elevated water tower and in instead agreeing to enter into the Asset Management contract with USCI.

5.20    USCI appeared at the City Council meeting to convince the City to contract with it.

5.21    USCI did not qualify, circumscribe or moderate any of its representations and promises concerning the structural integrity of the elevated water tower and its ability to repair and maintain the water tower in like new condition in compliance with AWWA standards. To the contrary, USCI went so far as to bring a Professional Engineer (who attests to be licensed in at least 30 different states) to the meeting to provide comfort to the City that USCI had a sound basis for its representations and promises.

5.22    The City actually and justifiably relied upon USCI's representations and thereby suffered injury.

5.23    The City did not go forward with its approved $2,000,000 bond sale for the purpose of replacing the elevated water tower. The City did not replace the elevated water tower. The City instead entered a multi-year, Full Service Asset Management contract with USCI to renovate and maintain its elevated water tower for ten years—the first five years of which were pre-paid—on May 21, 2013.

5.24    The City paid USCI for its promised services.

5.25    The City received and accepted USCI's purported inspection reports—dated June 5, 2015, and April 20, 2016. And the City did not fire USCI or hire anyone else to inspect, repair, or maintain the water tower between 2013 and 2017.

5.26    As a result, the City suffered the collapse and destruction of the elevated water tower and the loss of some 487,179 gallons of water.

## VI.

## LIABILITY—BREACH OF CONTRACT

6.01    Based upon the factual statements recited above, and those that follow below, the City alleges the following claim for breach of contract against USCI.

6.02    USCI breached its contract with the City of Aransas Pass. Relying on USCI's representations, the City and USCI entered into a valid multi-year, Full Service Asset Management contract with USCI to renovate and maintain its elevated water tower for ten years—the first five years of which were pre-paid—on May 21, 2013. The contract was in force on August 25, 2017, when the elevated water tower collapsed.

6.03    The City was in full compliance with its obligations under the contract at the time of the water tower's collapse.

6.04    USCI breached its obligations under the contract, including by:

- failing to provide the professional service needed to maintain the City's 500,000 gallon water storage tank;

- failing to reasonably, adequately and professionally complete an exterior renovation and repairs on the elevated water tower;

- failing, on an annual basis, to thoroughly inspect the tank and tower structure to ensure the structure was in a sound condition;

- failing to furnish engineering and inspection services needed to maintain and repair the water tower during the term of the contract;

- failing to repair and maintain the water tower as required to ensure the structure was in a sound condition;

- failing to repair and/or replace wind rods and other structural elements and steel parts in a reasonable, adequate and/or professional manner;

- failing to indemnify the City and hold the city harmless from any and all damages, liability, and expense in connection with damage to the elevated water tower by reason of any act, omission, or representation of USCI, its subcontractors, agents, or employees.

6.05    The City suffered damages resulting from USCI's breach(es) of contract.

## VII.

## <u>ACTUAL DAMAGES</u>

7.01     The City sustained actual damages that continue to this day, and include but are not limited to the cost of replacing the water tower, the difference between the value of the "like new" tower in compliance with AWWA standards promised by USCI and the value of the shoddy services actually performed by USCI, over $567,000 paid for the inspection, renovation and repair services that it did not get, reasonable costs for the removal and cleanup of the collapse site, costs associated with boil orders, and other consequential damages.

7.02     Actual damages are within the jurisdictional limits of this Court.

## VIII.

## <u>EXEMPLARY DAMAGES</u>

8.01     The City seeks exemplary damages for USCI's fraud.

8.02     Exemplary damages should be awarded in an amount sufficient to deter similar egregious conduct by USCI.

## IX.

## <u>ATTORNEY'S FEES</u>

9.01     The City is entitled to recover its reasonable attorneys' fees for USCI's breach(es) of contract as described above.

9.02     The City presented its claim to USCI on December 4, 2018, but payment for the just amount owed has not been tendered. Indeed, USCI has tendered no amount of money to the City despite the overwhelming evidence and admissions of liability.

## X.

### JURY DEMAND

10.01  The City respectfully demands a jury.

## XI.

### PRE-JUDGMENT AND POST JUDGMENT INTEREST

11.01  The City seeks pre-judgment and post-judgment interest.

**WHEREFORE, PREMISES CONSIDERED**, City of Aransas Pass prays Utility Service Co., Inc. be Cited and required to Answer and appear herein, and that upon a trial of the merits, Judgment be entered against Utility Service Co., Inc., including an award of actual damages, exemplary damages and attorney's fees, together with pre-judgment and post-judgment interest, and taxable costs.

City of Aransas Pass further prays for any and all further relief, both general and special, at law or in equity, to which it may show itself justly entitled.

Respectfully submitted,

THE WEST LAW FIRM

/s/ *S. Scott West*

S. SCOTT WEST
FBN: 12156
SBN: 21206920
1600 HIGHWAY SIX, SUITE 450
SUGAR LAND, TEXAS 77478
TEL: 281.277.1500
FAX: 281.277.1505
scott@westfirm.com

**ATTORNEY-IN-CHARGE
FOR PLAINTIFF**

**OF COUNSEL FOR PLAINTIFF:**

**RICHARD P. HOGAN, JR.**
Federal Bar No. 8026
State Bar No. 09802010
rhogan@hoganfirm.com
**JENNIFER BRUCH HOGAN**
Federal Bar No. 7187
State Bar No. 03239100
jhogan@hoganfirm.com

**HOGAN & HOGAN**
711 Louisiana, Suite 500
Houston, Texas 77002
713.222.8800–telephone
713.222.8810–facsimile